RENEE PORTEE, INDIVIDUALLY AND AS GENERAL ADMINIS-
TRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF
THE ESTATE OF GUY PORTEE, DECEASED, PLAINTIFF-AP-
PELLANT, v. EDITH JAFFEE, NATHAN JAFFEE, WATSON
ELEVATOR COMPANY AND ATLANTIC ELEVATOR COMPA-
NY, DEFENDANTS-RESPONDENTS.

Argued May 5, 1980—Decided July 29, 1980.

*Joseph Maran* argued the cause for appellant (Ira J. Zarin, attorney).

*Isaac Henkoff* argued the cause for respondents Edith Jaffee and Nathan Jaffee (*Klein, Chester, Greenburg & Henkoff,* attorneys).

*Gerald Kaplan* argued the cause for respondents Watson Elevator Company and Atlantic Elevator Company (*Lieb, Berlin & Kaplan,* attorneys).

The opinion of the Court was delivered by

PASHMAN, J.

We are asked to determine whether a parent can recover damages for the emotional anguish of watching her young child suffer and die in an accident caused by defendant's negligence. In *Falzone v. Busch,* 45 *N.J.* 559 (1965), this Court imposed liability for such infliction of mental or emotional distress when negligence created the potential, but not the occurrence, for physical harm to the traumatized individual. The question presented here is whether liability should exist where there was no potential for personal injury, but distress resulted from perceiving the negligently inflicted injuries of another.

Relying on *Falzone,* the trial court rejected liability and granted partial summary judgment for defendants on this issue, *R.* 4:46–3. After the Appellate Division granted plaintiff's motion for leave to appeal, we directly certified the case, *R.* 2:12–1. 82 *N.J.* 295 (1980). We now reversed the trial court and remand the matter for further proceedings.

The factual premises of this appeal are the uncontroverted assertions of plaintiff Renee Portee. In reviewing the dismissal of her claims as legally insufficient, we must accept as true all the allegations of the complaint, the affidavits and products of discovery submitted on her behalf. We must also draw those reasonable inferences that are most favorable to her cause. *E. g., Berman v. Allen,* 80 *N.J.* 421, 426 (1979); *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 133 (1973); *Judson v. Peoples Bank*

& *Trust Co. of Westfield,* 17 *N.J.* 67, 73–75 (1954); *R.* 4:46–2. The facts which follow are the result of this necessarily indulgent examination of the record.

Plaintiff's seven-year-old son, Guy Portee, resided with his mother in a Newark apartment building. Defendants Edith Jaffee and Nathan Jaffee owned and operated the building. On the afternoon of May 22, 1976, the youngster became trapped in the building's elevator between its outer door and the wall of the elevator shaft. The elevator was activated and the boy was dragged up to the third floor.[1] Another child who was racing up a nearby stairway to beat the elevator opened it, saw the victim wedged within it, and ran to seek help. Soon afterwards, plaintiff and officers of the Newark Police Department arrived. The officers worked for four and one-half hours to free the child. While their efforts continued, the plaintiff watched as her son moaned, cried out and flailed his arms. Much of the time she was restrained from touching him, apparently to prevent interference with the attempted rescue. The child suffered multiple bone fractures and massive internal hemorrhaging. He died while still trapped, his mother a helpless observer.

During the unsuccessful efforts to save Guy Portee's life, the police contacted the office of defendant Atlantic Elevator Company in nearby Belleville, New Jersey. Along with defendant Watson Elevator Company, which designed and built the elevator, Atlantic was responsible for the installation and maintenance of the elevator. The police requested that Atlantic send a mechanic to the building to assist in the attempt to free plaintiff's son. Apparently no one came.

After her son's death plaintiff became severely depressed and seriously self-destructive. On March 24, 1979, she attempted to take her own life. She was admitted to East Orange General Hospital with a laceration of her left wrist more than two inches deep. She survived and the wound was repaired by surgery, but she has since required considerable physical therapy and pres-

---

[1]The record does not indicate the floor on which the elevator started.

ently has no sensation in a portion of her left hand. She has received extensive counseling and psychotherapy to help overcome the mental and emotional problems caused by her son's death.

On December 2, 1976, plaintiff brought suit against the Jaffees and the two elevator companies. The complaint was premised on defendants' negligence in failing to provide a safe elevator.[2] As both general administratrix and administratrix *ad prosequendum* of the estate of Guy Portee, plaintiff asserted survival and wrongful death claims. *N.J.S.A.* 2A:15–3, :31–1. She also sued individually seeking damages for her mental and emotional distress caused by observing her son's anguish and death.[3]

Defendants Edith and Nathan Jaffee moved for summary judgment as to plaintiff's claims for mental and emotional distress on June 27, 1979. After a hearing the trial court granted the motion. In an oral opinion the court stated that *Falzone v. Busch, supra,* set the outer limits of liability for the negligent infliction of mental and emotional distress. The court noted that the Appellate Division had confirmed this view of *Falzone* in *Burd v. Vercruyssen,* 142 *N.J.Super.* 344 (1976), certif. den., 72 *N.J.* 459 (1976). Since plaintiff had concededly not been subjected to any risk of physical harm caused by defendants' alleged negligence, the trial court found that plaintiff's claims for psychological injury did not meet the requirements of *Falzone.*

Because the trial court considered this Court's decision in *Falzone* dispositive, we begin our discussion with that case. The plaintiff in *Falzone* had been placed in fear for her bodily safety

---

[2]We therefore find no occasion to consider whether liability would exist against defendant landlords for breach of their implied warranty of habitability. See *Trentacost v. Brussel,* 82 *N.J.* 214 (1980).

[3]The victim's father, who was estranged from plaintiff at the time of the fatal incident, filed a separate suit against defendants. Although the actions of both parents were consolidated for trial, the father's claims are not before us.

by negligent conduct. See 45 *N.J.* at 561. Although she sustained no physical impact, this Court ruled plaintiff could recover damages for substantial bodily injury or sickness induced by fright. *Id.* at 569. In so holding, the Court overruled a long-established line of cases which had required some physical impact, however slight, to recover for emotional injuries. See, *e. g., Tuttle v. Atlantic City R. R. Co.*, 66 *N.J.L.* 327 (E. & A.1901); *Consolidated Traction Co. v. Lambertson*, 60 *N.J.L.* 457, 458 (E. & A.1897); *Greenberg v. Stanley*, 51 *N.J.Super.* 90, 106 (App. Div.1958), mod. on other grounds, 30 *N.J.* 485 (1959); *Justesen v. Pennsylvania R. R. Co.*, 92 *N.J.L.* 257 (Sup.Ct.1919); *Ward v. West Jersey & S. R. R. Co.*, 65 *N.J.L.* 383 (Sup.Ct.1900); see also *Graf v. Taggart*, 43 *N.J.* 303, 312–313 (1964). It examined the three reasons given for the old rule, see *Ward, supra*, 65 *N.J.L.* at 385–386 and found them "no longer tenable." *Falzone, supra*, 45 *N.J.* at 563. The first reason—that physical injury was presumed not to be a probable or natural consequence of fright—was perceived by the Court as an issue to be resolved by medical evidence, not judicial presumption. *Id.* at 563–565. The *Falzone* Court rejected the second reason—that there was a lack of precedent or consensus in favor of recovery—as specious. *Id.* at 565–566; see *State v. Culver*, 23 *N.J.* 495, 505–507 (1957). The final reason traditionally advanced against liability was the prospect of recovery based on conjecture and speculation and a consequent flooding of the courts with groundless litigation. *Falzone, supra*, 45 *N.J.* at 566–567; see *Ward, supra*, 65 *N.J.L.* at 386. The *Falzone* Court responded by observing that the civil litigation process would safeguard against spurious and even fraudulent claims. 45 *N.J.* at 562. Finding the conventional rationales to be insufficient, the Court overruled *Ward* and held that "where negligence causes fright from a reasonable fear of immediate personal injury," the frightened person could recover damages for any resulting "substantial bodily injury or sickness." *Id.* at 569.

*Falzone* expressly required that any resulting bodily harm be substantial. *Id.* It did not, however, explicitly limit liability to cases in which the distressed plaintiff had been subjected to an

unreasonable risk of physical harm. See *id.* at 569–570. Nevertheless, since the new cause of action was in derogation of the prior inflexible requirement of physical impact,[4] some decisions interpreted *Falzone* narrowly. Liability has been denied where the plaintiff suffered distress without having been subjected to a risk of physical harm. *Burd v. Vercruyssen, supra; Kern v. Kogan,* 93 *N.J.Super.* 459 (Law Div.1967). Other cases have recognized the absence of such an express limitation in *Falzone.* When independently assessing foreseeable risks of emotional distress, courts have found possible liability for the negligent mishandling of a corpse, *Muniz v. United Hospitals Med. Cen. Presbyterian Hosp.,* 153 *N.J.Super.* 79 (App.Div.1977), and for the unreasonably aggravating handling of a consumer's complaint about a defective product, *Lemaldi v. De Tomaso of America, Inc.,* 156 *N.J.Super.* 441 (Law Div.1978); see also *Fiore v. Sears, Roebuck & Co., Inc.,* 144 *N.J.Super.* 74, 77 (Law Div.1976).

This Court has recognized that *Falzone* did not place express limits on negligence liability for mental or emotional distress. In *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69 (1966), we observed that questions of liability for non-intentional conduct were generally governed by the concepts of "duty, and the breach thereof, and proximate, or legal, cause of the injury * * *." *Id.* at 74. Applying this general analysis to cases involving the infliction of psychological but not physical injury, the Court approved the following formula:

> [L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted, thus then bringing the plaintiff within the "zone of risk." [*Id.* at 76 (quoting 2 F. Harper & F. James, *The Law of Torts* § 18.4 at 1036 (1956)]

---

[4]While inflexible, the traditional requirement of physical contact was often a mere formality. Contact unrelated to the source of plaintiff's fright was sufficient to permit recovery of damages for mental or emotional distress. See, *e. g., Greenberg v. Stanley,* 51 *N.J.Super.* at 105–106; *Porter v. Delaware, L. & W. R. R. Co.,* 73 *N.J.L.* 405, 406 (Sup.Ct.1906); *Buchanan v. West Jersey R. R. Co.,* 52 *N.J.L.* 265 (Sup.Ct.1890); see also *Friel v. Vineland Obstetrical and Gynecological Prof. Ass'n,* 166 *N.J.Super.* 579 (Law Div.1979) (physical impact of birth found to permit liability based on negligent medical care).

The Court recognized that *Falzone* had imposed liability occasioned by a risk of physical injury. 48 *N.J.* at 73. However, there was no requirement in the *Caputzal* formula that the "zone of risk" of mental or emotional distress coincide with a zone of risk of physical harm. More recently, in *Berman v. Allen, supra,* we held that where a doctor negligently failed to inform prospective parents that their child would likely suffer from severe genetic defects, the parents could recover damages for the emotional trauma of discovering their child's condition at birth. *Id.* 80 *N.J.* at 433.

Since *Falzone*, this Court's decisions have shown no hostility to the imposition of liability for negligently caused mental or emotional distress even without an attendant risk of physical harm. Our decision in *Berman* could support liability in this case. The trauma of witnessing the agonizing death of one's child may be no less substantial than the shocking realization that one's newborn child is profoundly crippled and will remain so for life. Both types of emotional injury also seem equally likely "in a person normally constituted," *Caputzal,* 48 *N.J.* at 76. The sole distinction between *Berman* and the present case may be described in terms of the degree of foreseeability. While in *Berman*, the mother was necessarily present at the birth of her child, and the father's presence was an all but certain eventuality, here the plaintiff was present at the scene of her son's death only because of the physical proximity of the accident to the mother's residence. Thus, one formulation of the issue before us is whether it was foreseeable that the mother would be observing the death of her young child.

The possibility that a parent may be near her young child is always substantial. Yet the recognition of a substantial possibility of harm does not resolve the question of liability. The standard is one of reasonable foreseeability, see *Caputzal,* 48 *N.J.* at 74–75; more directly stated, we must determine whether defendants owed a duty to the plaintiff that was violated when her child became trapped in the elevator. It might be argued that plaintiff had been continuously subjected to a risk of physical injury by the presence of a defective elevator in her

building. Although this reasoning would place the present case within the rule of *Falzone*, it would transform the requirement of a risk of physical injury into the same arbitrary formality as the former rule of physical impact, see *supra* at 94 n.4. Rather than adopt this artful yet artificial approach, we address directly whether defendants owed the mother a duty of reasonable care.

Few notions anywhere in the law are more vague than the fundamental concept of the law of negligence: the duty of reasonable care. This is because few are more closely linked with prevailing community standards of conduct. The issue of negligence is frequently a matter left to the judgment of the community as expressed by a panel of jurors. Although our courts have avoided attaching to this issue the confusing label of "a mixed question of law and fact," the phrase aptly connotes that juries in negligence cases as much make the law as apply it.

On many occasions, the law of negligence needs no other formulation besides the duty of reasonable care. Other cases, however, present circumstances rendering application of that general standard difficult, if not impossible. Without adequate guidance, juries may impose liability that is not commensurate with the culpability of defendant's conduct.

This difficulty has been recognized when courts considered liability for mental and emotional distress. We have noted the traditional argument, rejected by this Court in *Falzone*, that the imposition of such liability unoccasioned by any physical impact would lead to "mere conjecture and speculation." *Falzone, supra*, 45 *N.J.* at 566. Even where the causal relationship between conduct and emotional harm was clear, courts would deny liability unless the fault of defendant's conduct could be demonstrated by the occurrence of physical harm to the plaintiff. See *id.* at 564–565. Under *Falzone*, it became clear that the creation of a risk of physical harm would be a sufficient indication that defendant's conduct was unreasonable. Without such an indication, it might be argued that a jury could not form a reliable judgment regarding negligence. The question now before us is whether we are left to "mere conjecture and

speculation" in assessing the culpability of conduct that creates neither the risk nor the occurrence of physical harm.

The task in the present case involves the refinement of principles of liability to remedy violations of reasonable care while avoiding speculative results or punitive liability. The solution is close scrutiny of the specific personal interests assertedly injured. By this approach, we can determine whether a defendant's freedom of action should be burdened by the imposition of liability. In the present case, the interest assertedly injured is more than a general interest in emotional tranquility. It is the profound and abiding sentiment of parental love. The knowledge that loved ones are safe and whole is the deepest wellspring of emotional welfare. Against that reassuring background, the flashes of anxiety and disappointment that mar our lives take on softer hues. No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed.

Courts in other jurisdictions which have found liability in the circumstances before us have placed limits on this type of negligence liability consistent with their view of the individual interest being injured. In *Dillon v. Legg*, 68 *Cal.*2d 728, 441 *P.*2d 912, 69 *Cal.Rptr.* 72 (1968) (in bank), the California Supreme Court identified three factors which would determine whether an emotional injury would be compensable because "foreseeable":

(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. [*Id.* at 740, 441 *P.*2d at 920, 69 *Cal.Rptr.* at 80]

Those courts which have permitted actions for negligent infliction of emotional injuries unaccompanied by the risk of physical harm have adopted or followed these guidelines. See *D'Amicol v. Alvarez Shipping Co., Inc.*, 31 *Conn.Sup.* 164, 326 *A.*2d 129

(1973); *Kelley v. Kokua Sales & Supply, Ltd.,* 56 *Hawaii* 204, 532 *P.2d* 673 (1975); *Dziokonski v. Babineau,* 375 *Mass.* 555, 380 *N.E.2d* 1295 (Sup.Jud.Ct.1978); *Toms v. McConnell,* 45 *Mich.App.* 647, 207 *N.W.2d* 140 (1973); *Sinn v. Burd,* 486 Pa. 146, 404 *A.2d* 672 (1979); *D'Ambra v. United States,* 114 *R.I.* 643, 338 *A.2d* 524 (1975); *Landreth v. Reed,* 570 *S.W.2d* 486 (Tex.Civ. App.1978).

We agree that the three factors described in *Dillon* together create a strong case for negligence liability. In any given case, as physical proximity between plaintiff and the scene of the accident becomes closer, the foreseeable likelihood that plaintiff will suffer emotional distress from apprehending the physical harm of another increases. The second requirement of "direct * * * sensory and contemporaneous observance" appears to reflect a limitation of the liability rule to traumatic distress occasioned by immediate perception. The final criterion, that the plaintiff be "closely related" to the injured person, also embodies the judgment that only the most profound emotional interests should receive vindication for their negligent injury.

Our analysis of the specific emotional interest injured in this case—a fundamental interest in emotional tranquility founded on parental love—reveals where the limits of liability would lie. Addressing the *Dillon* criteria in reverse order, we find the last—the existence of a close relationship—to be the most crucial. It is the presence of deep, intimate, familial ties between the plaintiff and the physically injured person that makes the harm to emotional tranquility so serious and compelling. The genuine suffering which flows from such harm stands in stark contrast to the setbacks and sorrows of everyday life, or even to the apprehension of harm to another, less intimate person.[5] The existence of a marital [6] or intimate familial rela-

---

[5] A failure to recognize the contrast may have been responsible for the refusal of the New York Court of Appeals to permit this cause of action based on physical harm to another. See *Tobin v. Grossman,* 24 *N.Y.2d* 609, 615–617, 249 *N.E.2d* 419, 422–423, 301 *N.Y.S.2d* 554, 558–560 (1969).

[6] The common law action for loss of consortium may be perceived as a claim for negligently inflicted emotional injury. See *Ekalo v. Constructive Serv. Corp. of Amer.,* 46 *N.J.* 82, 86–91 (1965).

tionship is therefore an essential element of a cause of action for negligent infliction of emotional distress. In the present case, the instinctive affection of a mother for her seven-year-old son would be a sufficiently intimate bond on which to predicate liability.

The second requirement—that the plaintiff witness the incident which resulted in death or serious injury—is equally essential. We recognize that to deny recovery solely because the plaintiff was not subjected to a risk of physical harm would impose an arbitrary barrier that bears no relation to the injury to his basic emotional stability. See *Dillon v. Legg, supra,* 68 *Cal.*2d at 733, 441 *P.*2d at 915, 69 *Cal.Rptr.* at 75; *Toms v. McConnell, supra,* 45 *Mich.App.* at 653, 207 *N.W.*2d at 144. Yet avoiding arbitrary distinctions does not entail that a cause of action should exist for all emotional injuries to all the close relatives of the victim. This expansive view would extend judicial redress far beyond the bounds of the emotional interest entitled to protection. To avoid imposing liability in excess of culpability, the scope of recovery must be circumscribed to negligent conduct which strikes at the plaintiff's basic emotional security.

Discovering the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare. Ordinarily, however, only a witness at the scene of the accident causing death or serious injury will suffer a traumatic sense of loss that may destroy his sense of security and cause severe emotional distress. As Justice Cardozo stated in his classic formulation, "The risk reasonably to be perceived defines the duty to be obeyed." *Palsgraf v. Long Island R.R. Co.,* 248 *N.Y.* 339, 344, 162 *N.E.* 99, 100 (1928); see 2 F. Harper & F. James, *supra,* § 18.2 at 1018. Such a risk of severe emotional distress is present when the plaintiff observes the accident at the scene. Without such perception, the threat of emotional injury is lessened and the justification for liability is fatally weakened. The law of negligence, while it redresses suffering wrongfully caused by others, must not itself inflict undue harm by imposing an unreasonably excessive measure of liability.

Accordingly, we hold that observing the death or serious injury of another while it occurs is an essential element of a cause of action for the negligent infliction of emotional distress.

The first factor discussed in *Dillon* —that the plaintiff be near the injured person—embodies the same observations made concerning the other requirements of direct perception and close familial relationship. Physical proximity may be of some relevance in demonstrating the closeness of the emotional bond between plaintiff and the injured family member. For example, one would generally suppose that the risk of emotional distress to a brother who is halfway across the country is not as great as to a mother who is at the scene of the accident. The proximity of the plaintiff to the accident scene increases the likelihood that he will witness the event causing the death or serious injury of a loved one. Yet it appears that if the plaintiff must observe the accident that causes death or serious injury, a requirement of proximity is necessarily satisfied. The risk of emotional injury exists by virtue of the plaintiff's perception of the accident, not his proximity to it.

An additional factor yet undiscussed is the severity of the physical injury causing emotional distress. The harm we have determined to be worthy of judicial redress is the trauma accompanying the observation of the death or serious physical injury of a loved one. While any harm to a spouse or a family member causes sorrow, we are here concerned with a more narrowly confined interest in mental and emotional stability. When confronted with accidental death, "the reaction to be expected of normal persons," *Caputzal, supra,* 48 *N.J.* at 76 (quoting 2 F. Harper & F. James, *The Law of Torts* § 18.4 at 1035), is shock and fright. We hold that the observation of either death or this type of serious injury is necessary to permit recovery. Since the sense of loss attendant to death or serious injury is typically not present following lesser accidental harm, perception of less serious harm would not ordinarily result in severe emotional distress. Thus, the risk of an extraordinary reaction to less serious injury is not sufficient to result in liability. To impose liability for any emotional consequence of

negligent conduct would be unreasonable; it would also be unnecessary to protect a plaintiff's basic emotional stability. Therefore, a cause of action for emotional distress would require the perception of death or serious physical injury.

The cause of action we approve today for the negligent infliction of emotional distress requires proof of the following elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. We find that a defendant's duty of reasonable care to avoid physical harm to others extends to the avoidance of this type of mental and emotional harm. As Chief Justice Weintraub stated:

Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. [*Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583 (1962) (emphasis in original)]

Our inquiry has led us to conclude that the interest in personal emotional stability is worthy of legal protection against unreasonable conduct. The emotional harm following the perception of the death or serious injury to a loved one is just as foreseeable as the injury itself, for few persons travel through life alone. Ultimately we must decide whether protecting these emotional interests outweighs an interest against burdening freedom of conduct by imposing a new species of negligence liability. We believe that the interest in emotional stability we have described is sufficiently important to warrant this protection. At the same time we are confident that limiting judicial redress to harm inflicted on intimate emotional bonds by the death or serious injury of a loved one serves to prevent liability from exceeding the culpability of defendant's conduct.

A final matter remaining for consideration is the effect of the injured party's own negligence on plaintiff's right to recover. Under our Comparative Negligence Act, *L.* 1973, *c.* 146, *N.J.S.A.* 2A:15–5.1 to –5.3, the injured person's own recovery would be reduced by the proportion of his negligence so long as it was "not greater than the negligence of the person against

whom recovery is sought." *N.J.S.A.* 2A:15–5.1. To allow a plaintiff seeking damages for emotional injuries to recover a greater proportion than the injured party would surely create liability in excess of the defendant's fault. We therefore hold that any recovery for emotional harm resulting from perceiving the death or serious injury to another shall be reduced by the proportion of the injured party's negligence, as well as, of course, any contributing negligence of the plaintiff himself.

For the foregoing reasons, the judgment of the Superior Court, Law Division, is reversed.

*For reversal* —Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance* —none.